## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

HSBC BANK USA,
NATIONAL ASSOCIATION,

                    Plaintiff and Counter Defendant,

v.                                 CIVIL ACTION NO. 3:12-cv-00668

RON RESH and
VALARIE REYNOLDS-RESH,

                    Defendants; Counter Claimants; Counter Defendants;
                    and Third Party Plaintiffs,

v.

REALTY CONCEPTS, LTD;
HELEN SULLIVAN; and
LAWYER'S TITLE INSURANCE CORPORATION,

                    Third Party Defendants; Counter Claimants; Cross Claimants; and
                    Cross Defendants,

*and*

ANDREW BROSNAC,

                    Third Party Defendant and Cross Defendant.

### AMDENDED MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff HSBC Bank USA, National Association's ("HSBC

Bank") Motion for Summary Judgment (ECF No. 539) against Defendants Ron Resh and Valarie

Reynolds-Resh. For the reasons set forth below, Plaintiff's Motion is **GRANTED**.[1]

---

[1] This Amended Memorandum Opinion and Order is being issued to correct a few minor errors found in the original Memorandum Opinion and Order (ECF No. 639) issued on February 5, 2016, granting summary judgment to Plaintiff HSBC Bank against Defendants Ron Resh and Valarie Reynolds-Resh.

# I.      Background

In this case, HSBC Bank is seeking to recover alleged deficiencies that arose after foreclosure on deeds of trust to three commercial properties in Beckley, Morgantown, and Huntington, West Virginia. Plaintiff seeks to recover against Ron Resh and Valarie Reynolds-Resh individually and as the trustees of two different trusts, the Resh Living Trust and the Valarie Reynolds-Resh Living Trust (which have since been dissolved).[2]

The alleged deficiencies are based on three notes signed by the Reshes as trustees of the Resh Living Trust and the Valarie Reynolds-Resh Living Trust, and three personal guarantees of the notes, signed by the Reshes as individuals. Specifically, the total face value of the notes was $2,745,000.00: a $930,000.00 note issued for the purchase of the Huntington property, a note of $982,500.00 for the Beckley property, and a note of $832,500.00 for the Morgantown Property.[3] The Resh Living Trust was obligated on all three notes, and the Valarie Reynolds-Resh Living Trust was obligated on the $982,500.00 note for the Beckley property. All three notes were executed on April 27, 2006. Both Ron Resh and Valarie Reynolds-Resh, as individuals, executed unconditional guarantees on all three notes on the same day.[4] The notes were made payable to BLX Capital, LLC f/k/a BLC Capital Corp ("BLX Capital"). HSBC Bank filed this instant action

---

First, on page 2 and page 15 of the original Memorandum Opinion and Order, the Court incorrectly referred to HSBC Bank as the "predecessor" to BLX Capital. These misstatements have now been corrected to read "successor." Second, in Section III (G) of the original Memorandum Opinion and Order, the Court twice referred to HSBC Bank when it should have referred to BLX Capital. These errors have also been corrected. Finally, Footnote 1 in the original Memorandum Opinion and Order indicated that the dissolution of the Resh Living Trust and the Valarie Reynolds-Resh Living Trust had not been expressly stated. In fact, this dissolution was expressly stated by Ron Resh in his deposition testimony. This footnote now appropriately cites his testimony.

[2] *Pl.'s Reply to Defs.' Resp. in Opp. to Pl.'s Mot. for Summ. J.*, ECF No. 576, Ex. 1, at 5.

[3] The values of the notes and locations of the properties are taken from the Notes themselves, attached as Exhibit A to Plaintiff's Complaint. ECF No. 1, Ex. A. These are the same values used in Defendants' Counterclaim. ECF No. 20, at 12.

[4] It has been recently discovered that Mr. Resh failed to sign the Unconditional Guarantee for the Beckley property. This will be discussed in greater detail in Section III (B).

as indenture trustee and successor of BLX Capital.

Plaintiff alleges that the Defendants defaulted on their obligations under the notes in May 2009, and that in late December 2011, following notice and publication, Plaintiff foreclosed and sold the properties for a total of $555,100. In this action, Plaintiff seeks to recover deficiencies alleged to be owed under the notes. Plaintiff seeks to recover principal and interest, as well as costs, fees, expenses, and attorney's fees from Defendants Ron Resh and Valarie Reynolds-Resh.

After HSBC Bank commenced the instant litigation by filing a Complaint against the Reshes, (ECF No. 1), the Reshes filed an answer, affirmative defenses, and counterclaim. ECF No. 16. Soon thereafter, with leave of the Court, the Reshes filed an amended answer, affirmative defenses, counterclaim, and third party complaint. ECF No. 20 (collectively referred to as "Third Party Complaint"). In their Third Party Complaint, the Reshes allege that the appraisals of the three properties, conducted before purchase, fraudulently over-valued the properties. They also allege that they were misled into believing that Peanut Oil, LLC—a "dummy corporation" owned by Samuel Pearson—already owned the properties at the time that the sale of the three properties to the Reshes was being negotiated, when in reality the three properties were owned by Adventure 2000. Peanut Oil bought the properties from Adventure 2000, allegedly at a much cheaper price than the Reshes later paid, shortly before Peanut Oil sold the three properties to the Reshes. The Reshes bought the properties on or about April 28, 2006, with the agreement that Peanut Oil would fulfill a 15-year lease of the properties. Within a few years, Peanut Oil defaulted on the lease. Because of Peanut Oil's default, the Reshes were unable to fulfill their obligations to repay the underlying notes.

In general, the Reshes allege that they are the victims of a fraudulent scheme in which they were induced to purchase the properties based on fraudulent information about the properties'

ownership and value, which led them to enter into leases with a party who had no intentions of fulfilling those leases. This scheme was allegedly perpetrated so that the other parties could collect a windfall at the expense of the Reshes. Specifically, the Reshes allege:

> Count I: Fraudulent Misrepresentation
> Count II: Fraudulent Concealment
> Count III: Breach of Duty of Good Faith and Fair Dealing
> Count IV: Negligent Misrepresentation
> Count V: Negligence
> Count VI: Unjust Enrichment
> Count VII: Violations of the Racketeer Influenced & Corrupt Organizations Act ("RICO")

The Reshes assert these claims against: HSBC Bank; Realty Concepts, a real estate firm; Andrew Brosnac, the Reshes' realtor who allegedly was an employee of Realty Concepts; Lawyer's Title; and Helen Sullivan, a former employee of Lawyer's Title.[5]

At this juncture, the Court will address Plaintiff HSBC Bank's Motion for Summary Judgment against Defendants Ron Resh and Valarie Reynold-Resh. The Reshes have alleged all seven Counts listed above against HSBC Bank in their Counterclaim. ECF No. 20.

## II.     Summary Judgment Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

---

[5] This is a complete list the various claims Defendants have raised, but not all claims are brought against each Third Party Defendant.

*Corp.*, 475 U.S. 574, 587–88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

### III.    Analysis

A.  Deficiency Entitlement

The Court finds that HSBC Bank is entitled to the full amount of the deficiency under the Notes.[6] Although Defendants have raised affirmative defenses to reduce this amount, these defenses are without merit. Similarly, Defendants are not entitled to affirmative recoupment.

---

[6] This amount consists of principal in the amount of $2,618,894, interest to be determined, and costs to be taxed by the Court. *See Compl.*, ECF No. 1, at 2–5. The Court reserves and holds in abeyance Plaintiff's request for attorney fees and litigation costs until further order of the Court. This is outlined in the Judgment Order accompanying this Memorandum Opinion and Order.

Defendants argue that the Unconditional Guarantees, signed by the Reshes, making them individually liable, are not negotiable instruments. Therefore, the Guarantees are subject to the common law and not the UCC. In support of their proposition, Defendants cite *Gregoire v. Lowndes Bank*, 342 S.E.2d 264 (W. Va. 1986), which does indeed hold that an unconditional guarantee is not a negotiable instrument and therefore not subject to the rules and restrictions of the West Virginia Code or the UCC. *Id.* at 266–67. Therefore, the Unconditional Guaranties in this case are governed by the common law.

Under common law, "an absolute guaranty is an unconditional promise of payment or performance of the contract on default of the principal debtor or obligor." *Id.* at 268 (citing *Esso Standard Oil Co. v. Kelly*, 112 S.E.2d 461 (W. Va. 1960)). The Defendants point out that "a guarantor may be discharged or released by a breach of the contract of guaranty, or, at least to the extent of the injury, by any act or omission of the guarantee, in breach of his duty, that increases the guarantor's risk of otherwise injures his rights." *Id.* Therefore, consistent with that statement, a guarantor has the right to assert defenses, not affirmative recoupment, against payment of the guaranty. However, as will be explained throughout this Opinion, the Reshes have put forth no evidence indicating an "act or omission" by BLX Capital that "increased the [Reshes'] risk or otherwise injured [their] rights." Therefore, the Reshes are liable under common law for the entire amount of the deficiencies under the Unconditional Guarantees due to the default of the principal debtor/obligor.

B.  Failure to Sign Unconditional Guarantee for Beckley Property

It has recently been discovered that Mr. Resh did not sign the Unconditional Guaranty for the Beckley property. However, in Defendants' misguided attempts to evade liability for loans they borrowed, Defendants fail to negate the fact that Mr. Resh admitted and has indicated

throughout the litigation of this case that it was his intent to deliver Unconditional Guarantees on notes for all three properties (despite the fact that Defendants have now realized that his signature is missing). First, the Defendants admitted the Complaint's allegation that the Reshes "executed and delivered Unconditional Guarantees of the Notes." ECF No. 1, at 3. Second, the Defendants alleged in their Counterclaim that the Reshes were "nominal guarantors under the notes." *Countercl.*, ECF No. 20, at 8. Third, this Court has issued opinions and orders consistent with the fact that Mr. Resh was a guarantor under all three notes and the Defendants did not attempt to correct or otherwise inform the Court of this deficiency until now. This "missing signature defense" is untimely raised as this case is now over three years into litigation.

Therefore, although the Beckley Guarantee was not personally signed by Mr. Resh, Mr. Resh has admitted (and much of this litigation has been premised on those admissions) that he guaranteed the notes. These admissions are sufficient to bind Mr. Resh to the Unconditional Guaranty of the Beckley property because the testimony throughout this case indicated that Mr. Resh did in fact intend to be bound and that his missing signature was simply a clerical error.[7]

C. Demand and *Sostaric* Defense

Next, the Reshes argue that "where a guaranty has a condition precedent to its enforcement, that condition must be satisfied for the guaranty to become effective." *Defs.' Resp. in Opp. to Pl.s' Mot. for Summ. J.*, ECF No. 557, at 10. Here, Defendants claim that a notice of demand is required for the Unconditional Guarantees to be effective and that Plaintiff never made a sufficient demand on these Guarantees. The argument is without merit. First, the Reshes expressly waived demand. The Unconditional Guarantees state, "[g]uarantor waives any notice of. . . . presentment, dishonor,

---

[7] The Court notes that there may be additional grounds upon which to hold Mr. Resh accountable under the Beckley Unconditional Guaranty despite his missing signature or even to require him to sign the Beckley Unconditional Guaranty now. However, because of the analysis above regarding his previous admissions, the Court need not address those additional grounds.

protest, or demand." *Compl.*, ECF No. 1, Ex. B. However, even without this express waiver, sufficient demand was made by the filing of the instant civil action. "When an instrument is payable on demand, it is not necessary to aver and prove a demand and the institution of a suit upon such instrument, constitutes a sufficient demand." *Lightner v. Lightner*, 124 S.E.2d 355, 362 (W. Va. 1962). Therefore, even if a demand is necessary, this suit constitutes sufficient demand.

Finally, the Defendants argue that, under *Sostaric v. Marshall*, 766 S.E.2d 396 (W. Va. 2014), they can raise the affirmative defense that the fair market value for the three Jiffy Lube properties was not received at the foreclosure sale held by HSBC Bank, and as such, can present evidence of the real fair market value of the properties. *Id.* at 405. Although this is an accurate reflection of the holding in *Sostaric*, Defendants have failed to timely raise this defense. *Sostaric* was decided in November 2014. From October 2014, when the Fifth Amended Scheduling Order was vacated, through September 2015, when the Sixth Amended Scheduling Order was entered, the parties were actively litigating the Fourth Party Complaint filed by the Reshes. *See* ECF No. 402, ECF No. 509. Defendants had ample time to either motion the Court to amend their Amended Complaint to add this affirmative defense or extend discovery during this period to obtain a value determination. Defendants failed to do so.

Defendants argue that the *Sostaric* defense need not be asserted as an affirmative defense, and even if it did, multiple cases have found affirmative defenses may be raised at summary judgment so long as no unfair surprise or prejudice results. *Defs.' Surreply to Pl.'s Reply in Resp. to Defs.' Resp. in Opp. to Summ. J.*, ECF No. 585, at 5. This case has been pending since 2012 and is set to go to trial in four weeks on March 1, 2016. This untimely defense constitutes unfair surprise and prejudice. This property sale took place in 2011, and there has been no discovery concerning the market, the condition of the properties, nor other relevant circumstances as

Defendants had not raised this defense until now. Defendants could have raised this defense to the values of the properties obtained at the foreclosure sale at earlier stages of this litigation. Now, at the summary judgment phase, this defense is not properly before the Court.

*Sostaric* provides that "unless the deficiency defendant requests [a value determination], the foreclosure sale price, rather than the property's fair market value, will be used to compute the deficiency." *Id.* at 405. Here Defendants did not timely request a value determination. Therefore, the foreclosure price will be used to compute the deficiency.

> D. <u>Tort Claims (Fraudulent Misrepresentation, Fraudulent Concealment, Negligent Misrepresentation, Negligence)</u>

All seven of the Defendants' claims against HSBC Bank are premised on alleged acts or omissions of BLX Capital in the course of its activities as the lender in the contractual relationship between the BLX Capital and the Defendants. This relationship was formed through the loan documents signed by the parties, when the Reshes borrowed $2.745 million from the BLX Capital and unconditionally promised to repay the debt. Four of the abovementioned counts contained in the Reshes' Counterclaim sound in tort. Those four claims, fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation, and negligence, will be considered below.

Under West Virginia law, a plaintiff "cannot maintain an action in tort for an alleged breach of contractual duty." *Lockhart v. Airco Heating & Cooling*, 567 S.E.2d 619, 624 (W. Va. 2002). Rather, "[t]ort liability of the parties to a contract arises from the breach of some positive legal duty imposed by law because of the relationship of the parties, rather than from a mere omission to perform a contract obligation." *Id.* The West Virginia Supreme Court has referred to this relationship as a "special relationship" between the parties. *Aiken v. DeBow*, 541 S.E.2d 576, 583 (W. Va. 2000). In the context of a borrower and lender, a "special relationship" does not arise

9

unless "a lender performs services not normally provided by a lender to a borrower." *Blackburn v. Consumer Portfolio Serv., Inc.*, No. 2:11-00401, 2012 WL 1679796, at *2 (S.D. W. Va. May 14, 2012)

*Glascock v. City National Bank of West Virginia*, 576 S.E.2d 540 (W. Va. 2002) provides a clear example of when a "special relationship" does exist. The Supreme Court of West Virginia held that a "special relationship" existed in that case because of the unusual hands-on-approach the bank took with regards to construction of the Glascock home. This hands-on-approach imposed the duty on the bank to share the contents of a report indicating serious home defects. Specifically, the Court held that, because "the bank was significantly involved in the construction of the Glascock home," it "create[d] a special relationship with the borrower by maintaining oversight of, or intervening in, the construction project," and "that relationship brings with it a duty to disclose any information that would be critical to the integrity of" the project. *Id.* at 545–46. In other words, it is this special relationship portrayed in *Glascock* that imposes a duty to disclose critical information. This point was further emphasized by the Court in its statement that "[w]e are simply ruling that, where a bank and a [borrower] have a special relationship, the bank has a duty to disclose information when the bank could reasonably foresee that withholding that information might damage the borrowers." *Id.*

Here, this case is contrasted with *Glascock* in that there is no evidence of a "special relationship" between BLX Capital and the Reshes.[8] Even the Defendants' proposed expert on banking practice and procedure, Jason Koontz, stated:

---

[8] The *Glascock* Court also noted,

> [o]ur ruling should not be taken to mean that a traditional lender is in any way the insurer of the property that is the subject of the loan. Nor is the lender an insurer of the work performed or of an inspection or appraisal conducted on its behalf. Our ruling does not ask

Q: Did BLX engage in any activity with respect to this borrower that was outside of the normal lender/borrower relationship?

A: I think that BLX did less than what I would come to expect with a borrower and a customer.

Q: Now from your review of all the documents in this case, have you been able to develop a sense as to what the nature of the relationship was between Ron and Valerie Resh and BLX Capital, LLC, the lender?

A: As far as a relationship, I don't believe there was a relationship.

*Pl.'s Mot. to Strike Sham Aff.*, ECF No. 594, Ex. A, at 71, 53. Mr. Resh also states in his testimony:

Q: What was your relationship with the bank? Tell me about your contact with the bank and your communication with the bank.

A: I had no communication with the bank.

*Pl.'s Mot. for Summ. J.*, ECF No. 539, Ex. 2, at 325. In *Blackburn,* this Court stated that a "special relationship" does not arise unless "a lender performs services not normally provided by a lender to a borrower." 2012 WL 1679796 at *2. Here, BLX Capital only performed services normally provided by a lender to a borrower. No evidence has been disclosed of any "special relationship" or any special service provided outside this standard relationship. As such, absent a showing of a "special relationship," the Reshes are barred from asserting torts as claims or defenses to their contractual obligations to pay the Plaintiff for the outstanding deficiency.

Therefore, HSBC Bank's Motion for Summary Judgment is GRANTED in regards to Count I, Count II, Count IV, and Count V.

---

lenders to be engineers, or architects or home inspectors. As we stated, the duty is defined by the risk perceived.

*Id.* Therefore, even if a "special relationship" did exist between BLX Capital and the Defendants, *Glascock* makes it clear that disclosure of the allegedly overvalued appraisals would not have been required because the appraisals were not the type of critical information that must be disclosed (because BLX Capital would not have been the "insurer" of an appraisal conducted on its behalf).

E.  Covenants of Good Faith and Fair Dealing

Next, the Court will turn to the remaining three counts in Defendant's Counterclaim. In Count III of Defendants' Counterclaim, they allege a breach of the covenants of good faith and fair dealing against BLX Capital, and consequently HSBC Bank as indenture trustee. However, Defendants do not allege a separate breach of contract claim.[9] Absent a breach of contract claim, West Virginia does not recognize an independent claim for breach of the duty of good faith and fair dealing. *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 373 F. Supp. 2d 631, 644 (S.D.W. Va. 2005).

Defendants are correct that [t]he law . . . . implies a covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract." *Hoffmaster v. Guiffrida*, 630 F. Supp. 1289, 1290 (S.D.W. Va. 1986). However, it is also true that "this implied covenant is subsumed in the contract claim and cannot be plead as an independent cause of action." *Stand Energy Corp.*, 373 F. Supp. 2d at 644. Stated clearly, "West Virginia recognizes no such claim, and claims for breach of the implied covenant must be predicated on a breach of contract." *Powell v. Bank of America*, *N.A.*, 842 F. Supp. 2d 966, 982 (S.D.W. Va. 2012).

In *Evans v. United Bank*, *Inc.*, 775 S.E.2d 500 (W. Va. 2015) the court considered the dismissal of a "claim of breach of implied covenant of good faith and fair dealing on the basis that Petitioners failed to allege a breach of contract." *Id.* at 502. The case revolved around the same sort of claim that defines the Resh case: "an alleged fraudulent scheme involving [a bank] and [an

---

[9] Although Defendants did not allege a breach of contract claim, they do argue that BLX Capital assumed a duty to supervise and monitor the closing of the loans and "in failing to monitor the closing procedure, including the transfer of the escrow funds, the Bank clearly failed in this assumed duty." *Defs.' Resp. in Opp. to Pl.'s Mot. for Summ. J.*, ECF No. 557, at 23. Upon review of the commitment letters (*Defs.' Resp. in Opp. to Pl.'s Mot. for Summ. J.*, ECF No. 557, Exs. 22, 23, 24) there is no language in the documents that created a duty to monitor the closings, much less any language that created a disclosure requirement upon BLX Capital. As such, the BLX Capital did not breach any contractual duty or obligation imposed by any of the loan documents that formed the contract between BLX Capital and the Defendants.

appraiser] to inflate the value of property" that was purchased by the borrower with money borrowed from the bank. *Id.* The *Evans* Court noted that Mr. and Mrs. Evans "do not assert that [the bank] breached any of [the loan] contracts" and ruled that "the Evans' failure to allege breach of contract was fatal to their claim of a breach of the implied covenant of good faith and fair dealing." *Id.* at 509. *See also Wittenberg v. Wells Fargo Bank, N.A.*, 852 F. Supp. 2d 731, 750 (N.D.W. Va. 2012)("West Virginia does not recognize a stand-alone cause of action for failure to exercise contractual discretion in good faith. As such, a claim for breach of the implied covenant of good faith and fair dealing can only survive if the borrower pleads an express breach of contract claim.")(Internal citations omitted). Here, Defendants have failed to allege a breach of contract claims against HSBC Bank.

The Court recognizes that in an earlier order, ruling on a motion to dismiss, it allowed this claim to proceed against several parties by construing this claim in the light most favorable to the Defendants and recognizing that, although "inartfully drafted" it could be interpreted as a breach of contract claim. ECF No. 109. However, even taking that liberal interpretation into account, Defendants argument is still without merit. This is because in addition to failing to allege a breach of contract, there was no actual breach of contract. Defendant's own expert on banking practice and procedure confirms that there was no breach of the written contract in his deposition:

> Q: Did you find anything in the written documents that you reviewed that set forth an obligation on behalf of the lender that the lender did not perform?

> A: No.

*Pl.'s Mot. to Strike Sham Aff.*, ECF No. 594, Ex. A, at 126. Therefore, as in *Evans* and consistent with this Court's previous opinions, the failure to both allege and/or provide sufficient evidence to prove a breach of contract is fatal to the Reshes' claim for a breach of the implied covenants of good faith and fair dealing.

As such, Plaintiff's Motion for Summary Judgment is GRANTED in regards to Count III of the Counterclaim.

F.   Unjust Enrichment

Count VI alleges that HSBC Bank was unjustly enriched through the Notes and Unconditional Guarantees executed by the Reshes. The elements of an unjust enrichment claim are: "(1) a benefit conferred upon the [Bank], (2) an appreciation or knowledge by the [Bank] of such benefit, and (3) the acceptance or retention by the [Bank] of the benefit under such circumstances as to make it inequitable for the [Bank] to retain the benefit without payment of its value." *Veolia Es Special Servs., Inc. v. Techsol Chem. Co.*, No. 3:07-cv-0153, 2007 WL 4255280, at * 9 (S.D. W. Va. Nov. 30, 2007) (citing 26 WILLISTON ON CONTRACTS § 68:5 (4th ed.)).

Here, the Reshes' claim of unjust enrichment focuses on the payment of "principal and interest payments" that was made by the Defendants to the Plaintiff. *Countercl*., ECF No. 20, at 37. The Defendants assert that because the properties were allegedly overpriced, they executed notes for too high an amount, which led to BLX Capital receiving excess principal and interest payments. Therefore, Defendants claim that BLX Capital was unjustly enriched by these payments and that HSBC Bank is liable as BLX Capital's assignee.

This claim is also without merit. The reason this claim fails is twofold. First, the Plaintiff was not unjustly enriched. On April 28, 2006, BLX Capital paid out over $2.7 million upon the Notes and Unconditional Guarantees signed by the Defendants which they used to purchase three Jiffy Lubes. *Pl.'s Mem. in Supp. of its Mot. for Summ. J.*, ECF No. 41, at 25. When the Defendants stopped making payments, three years into these twenty-five year Notes, they had repaid approximately $792,000 on the Notes. *Id.* This evidences no "benefit conferred" on the Plaintiff.

Next, this claim fails because the subject of paying principal and interest is already covered

in an express contract between the Defendants and HSBC Bank. It is a "well-rooted principle" of contract law that "[a]n express contract and an implied contract, relating to the same subject matter, cannot co-exist." *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994) (quoting *Case v. Shepherd*, 84 S.E.2d 140, 144 (W. Va. 1954)). In order to get around this principle, Defendants claim that although the loan agreements do cover the payment of principal and interest, the payment of principal and interest, "far in excess" of what would have resulted had the properties been properly valued, constitutes a different subject-matter which is not covered in the express contractual agreement. *Countercl.*, ECF No. 20. Defendants cite *LaPosta Oldsmobile, Inc. v. General Motors Corp.,* 426 F. Supp. 2d 346 (N.D.W. Va. 3006) for this proposition that only where the subject matter of the implied contract and express contract are identical is a claim for unjust enrichment barred. Here, however, *LaPosta* inapplicable because the subject matter regarding Defendants' claim for unjust enrichment is identical to the subject matter of the express contract.

Furthermore, in *Laposta*, as Plaintiff points out, the plaintiff's unjust enrichment was not barred because plaintiff specifically alleged that it provided "multiple benefits upon GM . . . . all of which fall outside the scope and requirements of the Plaintiff's Sales and Services Agreement." *Compl.*, No 5:05-cv-00079, ECF No. 1. This case is contrasted with *Laposta* in that, here, the principal and interest payments due to HSBC Bank were clearly covered in an express contract. No payments, services, benefits, etc. fell outside of the contractual agreement found in Notes and Unconditional Guarantees. As such, there can be no implied contract to form the basis of Defendants' unjust enrichment claim from payment of alleged "excess" principal and interest, when payment of principal and interest is the subject matter of the express contract.

Because of this and due to the fact that no benefit was conferred on the Plaintiff (as the

Reshes only paid back a fraction of the loan they received) Plaintiff's Motion for Summary Judgment on Count VI of the Counterclaim is GRANTED.

G.  RICO

Count VII alleges that HSBC Bank, as successor of BLX Capital, engaged in violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1961, *et. seq*. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." § 1962(c). The Supreme Court has clarified that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Specifically, that individual "must participate in the operation or management of the enterprise itself." *Id.* at 185. A pattern of racketeering activity is defined as "at least two acts of racketeering activity," § 1961(5), and racketeering activity includes mail fraud and wire fraud, § 1961(1), which Defendants allege occurred here. The elements of mail fraud and wire fraud are: "(1) the existence of a scheme to defraud and (2) the use of the mails or wire communication in furtherance of the scheme." *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006).

HSCB Bank argues that BLX Capital lacked the requisite amount of control over the alleged enterprise, and for this reason the RICO claim against HSBC Bank must be dismissed. *See First Cent. Sav. Bank v. Meridian Residential Capital*, No. 09-cv-3444, 2011 WL 838910 (E.D.N.Y. Mar. 3, 2011) (dismissing RICO claim against appraisal company alleged to have over-appraised the value of properties, where there were no facts showing that the appraisal company had control over the alleged enterprise); *Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 373

F. Supp. 2d 829 (S.D. Ind. 2005) (dismissing RICO claims against appraisers because their participation in alleged overvaluing of properties did not satisfy the *Reves* operation and management test); *see also Reves*, 507 U.S. at 186. The Court has already dismissed several parties from this dispute due to Defendants' failure to adequately plead and/or sufficiently provide evidence to prove that the respective parties had control over the alleged RICO enterprise that Defendants themselves concede "consisted of Brosnac, Pearson, and Sullivan" at its core. *Third Party Pls.' Mem. in Opp. of Mot. to Dismiss*, ECF No. 44, at 18. Once again, for reasons nearly identical to the Court's analysis in two prior opinions, the Court finds Defendants' arguments regarding BLX Capital's involvement in the alleged RICO scheme unfounded.

As Plaintiff points out, Mr. Resh himself claims BLX Capital's role in the scheme was limited to (a) failure to check the creditworthiness of the tenant, (b) accepting a faulty appraisal, and (c) not telling him that this was a "flip" or "double-escrow" transaction. *Pl.'s Mem. in Supp. of its Mot. for Summ. J.*, ECF 541, at 28. In other words, Defendants main complaint is that BLX Capital did not act as a "normally prudent lender." *Defs.' Resp. in Opp. to Pl.'s Mot. for Summ. J.*, ECF No. 557, at 29. These accusations, however, are not evidence sufficient to support an allegation of participation in a RICO scheme, nor are they evidence of any control that BLX Capital exercised over an alleged RICO scheme. Simply put, Defendants provide no evidence, besides repeatedly claiming that the BLX Capital was not prudent enough in evaluating a loan, that BLX Capital participated in the operation or management of an alleged RICO enterprise.

Furthermore, Ron Resh specifically indicated in his own testimony that he did not believe BLX Capital conspired in any alleged enterprise or that there even was an enterprise beyond Andrew Brosnac and Sam Pearson.

Q: Well, I'll summarize it again. Based on your answers to prior questions about whether you had facts of conduct or facts about conduct of the bank, am I correct

in assuming that when you talk about BLX and PGP valuation being complicit in paragraph 72, that what you really mean is just that PGP came up with a faulty appraisal on its own and that the bank on its own failed to catch the fact that the appraisal was faulty? That they didn't conspire together to cook it up; they acted independently.

A: Yes.

Q: Right. But as far as these allegations of wrongdoing – and I'll throw the title company in there, too – that you testified before that the bank, the appraiser, and the title company – although you think all three did something wrong or things wrong – that they did those things wrong independently, that they didn't combine together –

A: No. I don't think they plotted.

*Pl.'s Mot. for Summ. J.*, ECF No. 539, Ex. 2, at 296, 353. While his statements are not fatal to the

RICO claim on their own, his testimony does nothing to bolster the claim that BLX Capital

participated in, let alone exercised the requisite amount of control over, the alleged RICO

enterprise. This lack of control is sufficient grounds for dismissing the RICO claims against HSBC

Bank. Therefore, HSBC Bank's Motion for Summary Judgment as to the RICO claim is

GRANTED and Count VII is dismissed.

## IV.    Conclusion

For the foregoing reasons, Plaintiff HSBC Bank's Motion for Summary Judgement (ECF

No. 539) against Defendant Ron Resh and Valarie Reynolds-Resh is **GRANTED**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel

of record and any unrepresented parties.


ENTER:        February 8, 2016


_____
ROBERT C. CHAMBERS, CHIEF JUDGE

18