## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

RON RESH and
VALARIE REYNOLDS-RESH,

                         Third Party Plaintiffs,

v.                                        CIVIL ACTION NO. 3:12-cv-00668

REALTY CONCEPTS, LTD;
HELEN SULLIVAN; and
LAWYER'S TITLE INSURANCE CORPORATION,

                         Third Party Defendants; Counter Claimants; Cross Claimants; and
                         Cross Defendants,

*and*

ANDREW BROSNAC,

                         Third Party Defendant and Cross Defendant.

### MEMORANDUM OPINION AND ORDER

Pending before the Court are Third Party Defendants Helen Sullivan and Lawyer's Title Insurance Corporation's ("Lawyer's Title") Joint Motion for Summary Judgment on all Claims Asserted Against them by Third Party Plaintiffs Ronald Resh and Valarie Reynolds-Resh (ECF No. 538) and Third Party Defendants Helen Sullivan and Lawyer's Title Insurance Corporation's Joint Motion for Summary Judgment on all Claims Asserted Against them by Third Party Defendant Realty Concepts, Ltd. (ECF No. 542). For the reasons set forth below, Third Party Defendants Helen Sullivan and Lawyer's Title's Joint Motions are **GRANTED**.

### I.      Background

HSBC Bank USA, National Association ("HSBC Bank") commenced the instant litigation by filing a Complaint against the Reshes, seeking over $2.6 million in unpaid principal due on three promissory notes executed by the Reshes, as well as interest, costs, fees, and expenses. *Compl.*, ECF No. 1. The Reshes had executed these three notes in order to purchase three commercial properties in Beckley, Morgantown, and Huntington, West Virginia, which all contained "Jiffy Lube" franchises.

The Reshes subsequently filed an answer, affirmative defenses, and counterclaim. ECF No. 16. Soon thereafter, with leave of the Court, the Reshes filed an amended answer, affirmative defenses, counterclaim, and third party complaint. ECF No. 20 (collectively referred to as "Third Party Complaint"). In their Third Party Complaint, the Reshes allege that the appraisals of the three properties, conducted before purchase, fraudulently over-valued the properties. They also allege that they were misled into believing that Peanut Oil, LLC—a "dummy corporation" owned by Samuel Pearson—already owned the properties at the time that the sale of the three properties to the Reshes was being negotiated, when in reality the three properties were owned by Adventure 2000. Peanut Oil bought the properties from Adventure 2000, allegedly at a much cheaper price than the Reshes later paid, shortly before Peanut Oil sold the three properties to the Reshes. The Reshes bought the properties on or about April 28, 2006, with the understanding that Peanut Oil would fulfill a 15-year lease of the properties. The Reshes purchased the properties for over $3.5 million, making a collective down payment of a little less than $1 million and executing notes for the remainder. Shortly thereafter, Peanut Oil defaulted on the lease. Because of Peanut Oil's default, the Reshes were unable to fulfill their obligations to repay the underlying notes.

The Reshes allege that they are the victims of a fraudulent scheme in which they were induced to purchase the properties based on fraudulent information about the properties'

ownership and value, and it led them to enter into leases with a party who had no intention of fulfilling those leases. This scheme was allegedly perpetrated so that the other parties could collect a windfall at the expense of the Reshes. Specifically, the Reshes allege:

Count I: Fraudulent Misrepresentation
Count II: Fraudulent Concealment
Count III: Breach of Duty of Good Faith and Fair Dealing
Count IV: Negligent Misrepresentation
Count V: Negligence
Count VI: Unjust Enrichment
Count VII: Violations of the Racketeer Influenced & Corrupt Organizations Act ("RICO")

The Reshes assert these claims against the following Third Party Defendants: Realty Concepts, a real estate firm; Andrew Brosnac, who allegedly was an employee of Realty Concepts and was the Reshes' realtor; Lawyer's Title Insurance Corporation ("Lawyer's Title"); and Helen Sullivan, a former employee of Lawyer's Title.

At this juncture, the Court will address Third Party Defendants Helen Sullivan and Lawyer's Title's Joint Motion for Summary Judgment against Third Party Plaintiffs Ron Resh and Valarie Reynolds-Resh. ECF No. 538. The Court will also address Third Party Defendants Helen Sullivan and Lawyer's Title's Joint Motion to Summary Judgment against Third Party Defendant Realty Concepts, Ltd. regarding Realty Concept's cross claims for contribution and indemnification. ECF No. 542.

## I.     Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in

3

the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

## II.      Analysis

### A.   Factual backdrop to understand posture of claims

Mr. Resh was a seasoned and experienced investor when the real estate transactions that are the subject of this litigation took place. He had been investing in residential property for over 20 years before he decided to venture into commercial real estate property, having built a residential real estate investment portfolio worth approximately $20 million invested in 40-50

residential properties. *Third Party Defs.' Mot. for Summ. J.*, ECF No. 538, Ex. 1, at 17–19, 76–77. In 2005, Mr. Resh decided to move into commercial real estate, and was introduced to Andrew Brosnac, a real estate agent with Realty Concepts, Ltd. He chose to hire Mr. Brosnac and Realty Concepts, Ltd. to assist him in this transition. *Id.* at Ex. 1, at 19.

Separately in 2005, Adventure 2000, LLC, a West Virginia limited liability company controlled by John Spaar, and five other related entities also controlled by him, decided to sell several Jiffy Lube properties which they owned and operated. *Third Party Defs.' Mem. in Supp. of Mot. for Summ. J.,* ECF No. 540, at 2. Michael Baynes, broker for Mr. Spaar, approached Samuel Pearson to suggest that he finance the transaction through a sale-leaseback where Peanut Oil, an entity controlled by Mr. Pearson, would commit to buying the Jiffy Lube properties (both the real estate and the operating businesses) offered by Adventure, re-sell the real estate, and then lease them back from the purchaser(s), leaving Peanut Oil to operate the business. *Id.* at 2–3; *Third Party Defs.' Mot. for Summ. J.*, ECF No. 538, Ex. 2, at 12–13. Mr. Pearson, had extensive experience with Jiffy Lube, spanning almost 20 years, including working for Jiffy Lube International where he oversaw the operation of approximately 100 Jiffy Lube stores. *Third Party Defs.' Mot. for Summ. J.*, ECF No. 538, Ex. 2, at 10–11, 58–59, 162.

In May of 2005, Peanut Oil entered into an Asset Purchase agreement with Adventure 2000 to purchase several Jiffy Lube properties. *Id.* at Ex. 2, at 14–15, 18–19. Mr. Pearson marketed the Jiffy Lube properties, using Upland Real Estate Group, Inc. as the broker. *Id.* at Ex. 2, at 18–20, 13–14. Peanut Oil, along with input from Upland and Mr. Baynes, fixed what the monthly lease payments would be for the Jiffy Lube properties. *Id.* at Ex. 2, at 139–140.

It was at this point that Mr. Brosnac found the West Virginia Jiffy Lube properties for the Reshes. *Id.* at Ex. 1, at 34, 49. In December 2005, the Reshes signed a Real Estate Sale Agreement

to purchase all three properties. *Id.* at Ex. 3. The transaction with Mr. Resh was structured as a double escrow transaction with a sale-leaseback, with the Reshes buying the Properties and leasing them back to Peanut Oil to operate. The nature of this double escrow and sale-leaseback was clearly presented to Mr. Resh in the following ways:

1. The Real Estate Sale Agreement, which Mr. Resh admits signing in December 2005, states, in pertinent part, that Peanut Oil as Seller:

   [I]s the **contract purchaser** with regard to certain **real estate** . . . .[1]

   [H]ereby discloses to Purchaser and Purchaser hereby acknowledges that Seller, or an entity owned or controlled by Seller, **is the contract purchaser of the Property under an Asset Purchase Agreement (the "APA") with Adventure 2000, LLC et al. ("the Owner")** and intends to complete the purchase of the Property on or before January 30, 2006 (the "APA Closing Date"). However, the parties understand and agree that this Agreement and Seller's obligations under this Agreement are contingent upon Seller closing on the purchase of the Property under the APA.

   *Id.* at Ex. 1, 107–108; Ex. 3, at 1 (emphasis added).[2]

2. The April 10, 2006 amendment to the Real Estate Sale Agreement, which Mr. Resh also admits signing, states:

---

[1] This clause is contained at the beginning of the real estate agreement in Section A. It explicitly states that the seller, Peanut Oil, is the contract purchaser with regards to "real estate." This contradicts Mr. Reshes' testimony that it was his understanding that Peanut Oil, as the contract purchaser, was only buying the equipment and merchandise of the operation. *Third Party Pls.' Resp. to Third Party Defs.' Mot. for Summ. J.*, ECF No. 555, Ex. 1, at 290. The contract terms clearly indicate that Peanut Oil was the contract purchaser of "real estate" not simply real property. As such, Mr. Reshes' argument is unfounded.
[2] It appears that in addition to the main Real Estate Sale Agreement referenced above (that covered all three properties), there were also three separate Real Estate Sale Agreements that covered each individual property. *Third Party Pls.' Resp. to Third Party Defs.' Mot. for Summ. J.*, ECF No. 555, Exs. 11–13. The Reshes argue that although Mr. Resh signed the main Real Estate Sale Agreement, the other Real Estate Sale Agreements covering each individual property contain allegedly fraudulent signatures. *Third Party Pls.' Resp. to Third Party Defs.' Mot. for Summ. J.*, ECF No. 555, at 11. This argument is of no significance though because Mr. Resh admits to signing the main Real Estate Sale Agreement. *Third Party Defs.' Mot. for Summ. J.*, ECF No. 538, Ex. 1, at 107–108. Included in this main Agreement, as Exhibit A, is a list titled "Property Description" that lists each of the three properties in dispute with their respective addresses. *Third Party Defs.' Mot. for Summ. J.*, ECF No. 538, Ex. 3, at ex. A. Therefore, Mr. Reshes' signature on the main Real Estate Sale Agreement is sufficient to bind him to the terms contained therein for each of the three properties in dispute.

> As you know the parties met today, via conference call, along with Michael Baynes of Lube Center Sales to agree upon certain changes to the existing agreement where Mr. Pearson's entity would acquire assets from Mr. Spaar's entities and in change [sic] **to a sale/leaseback of those assets with Mr. Resh's entity**.
>
> Therefore, the parties, Resh, Spaar, and Pearson have agreed to contribute $157,034, each, which along with the equity provided by Resh and an anticipated bank loan to Resh from Business Loan Express (LOI attached) will provide the required funds for closing.

> *Id.* at Ex. 1, at 79–80; Ex. 4 (emphasis added).

Additionally, prior to the closing, the following actions or inactions were taken by Mr. Resh:

1. Mr. Resh received and reviewed balance sheets and profit and loss statements for the operators of the three Properties. He did not have an accountant look over that information, did not obtain a separate appraisal of the three properties, and largely did not perform any individual investigation into the investment. *Id.* at Ex. 1 at 65–71, 277–278; Exs. 5, 6.

2. Appraisals were obtained for the Properties for the use of the lender in making the loan to the Reshes. Even when one of the appraisals did not support the purchase price, resulting in a downward adjustment of price, Mr. Resh made no investigation, nor did he ever ask to see the appraisals. *Id.* at Ex. 1, at 79–80.

3. Mr. Resh examined income statements concerning the operations of the three Properties and signed them. *Id.* at Ex. 1, at 71; Ex. 6.

Then, on April 28, 2006, Peanut Oil closed on its agreement to buy the Properties from Adventure, and the Reshes completed their purchase from, and lease-back to, Peanut Oil for the three properties. Each leg of the double escrow closed one after another, with Helen Sullivan as the escrow agent.

Most of the abovementioned facts, however, all occurred before Helen Sullivan became involved in this transaction. Ms. Sullivan functioned as the escrow agent for the Reshes' closing

and did not become involved in in this transaction until after the Real Estate Sale Agreement was signed in December 2005. *Id.* at Ex. 7, at 125. She never worked with Mr. Pearson or Mr. Brosnac before this transaction. *Id.* at Ex. 2, at 45–46, 87. She also never saw the appraisals for the properties. *Id.* at Ex. 7, at 77.

The Reshes' claims against Ms. Sullivan and Lawyer's Title stem from her role as the escrow agent in the closing of sale on these West Virginia properties to the Reshes. Specifically, there is a section of the Real Estate Sale Agreement that designates an escrow agent and references duties and obligations to be performed by the agent. *Id.* at Ex. 3, at 12. There is also an exhibit attached to the Real Estate Sale Agreement titled "Earnest Money Escrow Instructions," addressed to Lawyer's Title. *Id.* at Ex. 3, at ex. B.

### B. Fraudulent Misrepresentation

In Count 1, the Reshes seek to recover against Ms. Sullivan and her employer, Lawyer's Title, for "intentionally fail[ing] to disclose to Defendants that she had assisted with the closing of the sale of each of the West Virginia properties to Peanut Oil immediately prior to their sale to Defendants, at substantially lower prices." *Third Party Compl.*, ECF No. 20, at 22–23. The elements of fraudulent misrepresentation are: "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it." Syl. Pt. 4, *Cobb v. E.L. DuPont deNemours & Co.*, 549 S.E.2d 657 (1999).

First, this claim fails because the double escrow nature of the transaction was disclosed to both the Reshes and Mr. Brosnac, the Reshes' representative. Both legs of this transaction closed on the same day, April 28, 2006. *Third Party Defs.' Mem. in Supp. of Mot. for Summ. J.*, ECF No. 540, at 4. Andrew Brosnac was present at this closing as the representative of the Reshes. Mr.

8

Brosnac clearly knew and understood both legs of this transaction ((1) Peanut Oil closed on its agreement to buy the Properties from Adventure, and (2) the Reshes completed their purchase from, and lease-back to, Peanut Oil of the three Properties). Therefore, there could be no failure on the part of Helen Sullivan to disclose this information, when the closing for each leg of the transaction occurred on the same day in the presence of the Reshes' representative.

Next, critical to this claim, is the allegation that the Defendants did not know about the double escrow nature of the sale, and "[b]ecause they supposedly did not know Peanut Oil first had to buy the Properties before selling them, they contend a fraud was perpetrated as the double escrow nature of the transaction allowed Peanut Oil to first buy at a low price, then immediately sell to the Reshes at a significantly, and supposedly fraudulently, higher price, using the Reshes' credit the finance the entire transaction." *Third Party Defs.' Mem. in Supp. of Mot. for Summ. J.*, ECF No. 540, at 6–7. This is not supported by the evidence provided in this case. As noted under Section II of this Opinion, Mr. Resh signed both the Real Estate Sale Agreement and the Amendment to the Real Estate Sale Agreement on December 13, 2005 and April 10, 2006, respectively. Under West Virginia law, "in the absence of extraordinary circumstances, the failure to read a contract before signing it, does not excuse a person from being bound by its terms." *Sedlock v. Moyle*, 668 S.E.2d 176, 180 (W. Va. 2008).

Both the agreement and the amendment to the agreement contain clauses that clearly indicate the double escrow nature of the transactions.[3] Because Mr. Resh signed both of these documents, his failure to read the documents and appropriately investigate and/or ask questions regarding specific language contained therein does not relieve him of his duty to know what the documents meant. Therefore, as a matter of law, the Reshes knew about the double escrow nature

---

[3] See infra pgs. 6–7

of the transaction. As such, the Reshes cannot predicate a claim for fraud upon the failure of Helen Sullivan to disclose information that was already known to them. If the Third Party Plaintiffs were already aware of the facts, then there could be no 'fraudulent' act in the first place. Additionally, if Mr. Brosnac misled the Reshes about the transactions, as the Reshes claim he did, this is not Helen Sullivan or Lawyer's Title's fault.

There is also no basis for the Reshes' fraudulent misrepresentation claim because Ms. Sullivan had no duty to disclose this information. The Reshes point to no legal authority which imposes a duty on Ms. Sullivan, as an escrow agent, to disclose the double escrow nature of a transaction or to explain how financing was to be arranged.[4] Her responsibilities solely included obtaining signatures on the documents and disbursing the funds as directed by the parties. *Third Party Defs.' Mem. in Supp. of Mot. for Summ. J.*, ECF No. 540, at 11; *See Third Party Defs.' Mot. for Summ. J.*, ECF No. 538, Ex. 7, at 74, 128. Furthermore, not only did she not have a duty, Ms. Sullivan had no legal right to prepare, review, or interpret documents that were used in these transactions. This is because in West Virginia, other than basic ministerial tasks, all legal work must be handled by an attorney. *Id; see May v. Nat'l Mortg., LLC*, 2012 WL 3028467 (N.D.W. Va. July 25, 2012); *Shelton v. Wells Fargo Bank*, 2010 WL 10152301 (N.D.W. Va. August 13, 2010).

The only alleged misrepresentation the Third Party Plaintiffs point to involves Ms. Sullivan's alleged "communications to the Reshes that Peanut Oil, and not Adventure 2000, was the owner of the Properties on the date the Reshes closed the transaction in the form of the closing

---

[4] Although part of the Real Estate Sale Agreement details the duties of the designated escrow agent, nothing in the agreement implies duties like those advocated for by the Reshes. *Third Party Defs.' Mot. for Summ. J.*, ECF No. 538, Ex. 3, at 12, ex. B. Additionally, the Reshes reference their expert, Susanne Lunsford, in arguing that Ms. Sullivan had a duty to disclose the double escrow nature of the transaction. This argument will be discussed infra at Section III (C).

statements she prepared and sent to the Reshes." *Third Party Pls.' Resp. to Third Party Defs.' Mot. for Summ. J.*, ECF No. 555, at 12. Upon review of these documents, there is no such fraudulent communication. As was previously stated, Ms. Sullivan was involved in the closing documents for both legs of the double escrow transaction. Therefore, it would make sense that the second leg of the transaction reflected that Peanut Oil was selling the Properties to the Reshes. The first leg, to which the Reshes were not a party, would have reflected Adventure 2000 selling the Properties to Peanut Oil. In other words, because both legs of the double escrow transaction took place at one closing, it is logical that the closing statements mailed to the Reshes reflected Peanut Oil as the 'seller.' Furthermore, the closing documents were sent to the Reshes after the closing; therefore, even if there was a misrepresentation contained in those documents, there would have been no reliance on that misrepresentation prior to closing the transaction. As such, this was not a fraudulent misrepresentation.

Finally, Third Party Plaintiffs argue that "[i]f Sullivan made any misrepresentations, even with the knowledge of the parties that she communicated with, that would have been intended to deceive a third party, and that was communicated to the Reshes, through Mr. Brosnac, through BLX, or through any other party, then under *Lowance* Sullivan would herself be liable." *Third Party Pls.' Resp. to Third Party Defs.' Mot. for Summ. J.*, ECF No. 555, at 13. Upon consideration of *Lowance*, the court in this case did not hold that a misrepresentation made to "any party" could be the basis of liability, but rather limited it to situations "where false representations are made to an agent, for the purpose of inducing him to act upon them on behalf of his principal . . . ." *Lowance v. Johnson*, 84 S.E. 937, 940 (W. Va. 1915). As such, the Reshes must point to evidence that Ms. Sullivan made misrepresentations to Mr. Brosnac, who then relayed the misrepresentations to the Reshes, upon which the Reshes then relied. The only evidence Third Party Plaintiffs reference are

two emails addressed to Ms. Sullivan. These emails were not sent from her and therefore are not her statements (or alleged misrepresentations). Third Party Plaintiffs also provide no evidence that they saw these emails prior to closing so as to have been misled. Finally, the Reshes provide no other evidence, only speculation regarding what Ms. Sullivan would have spoken to Mr. Brosnac about, to support this generalized claim. For these reasons, the Reshes claim for fraudulent misrepresentation against Ms. Sullivan and Lawyer's Title must fail.

As such, the Court GRANTS Third Party Defendants' Joint Motion for Summary Judgment with respect to Count 1 of the Third Party Complaint.

C. Fraudulent Concealment

In Count II of the Third Party Complaint, the Reshes seek to recover against Helen Sullivan and Lawyer's Title for fraudulent concealment based upon an alleged duty to disclose that "the prices Defendants were paying for these properties were far in excess of their actual values" and that "the appraisals upon which the prices for all three transactions were largely premised were based on faulty methodologies, insufficient and unreliable data, and the prospective tenants and other aspects of the appraisals were not properly investigated." *Third Party Compl.*, ECF No. 20, at 26–27. "Fraudulent concealment involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." *Trafalgar House Constr., Inc. v. ZMM, Inc.*, 567 S.E.2d 294, 300 (W. Va. 2002). This argument is without merit.

First, regarding the appraisals, Ms. Sullivan testified that she never saw the appraisals for the Properties, nor would she typically review appraisals as an escrow agent. *Third Party Defs.' Mot. for Summ. J.*, ECF No. 538, Ex. 7, at 77, 105–106. Next, as to both the appraisals and the prices or values of the three Properties, Ms. Sullivan testified that she had no involvement in

preparing the documents used, was only involved in the transaction once there was already an agreement in place, and relied on information provided to her by the parties regarding the disbursement of funds. Relevant excerpts of her testimony are as follows:

> Q: When – when a transaction comes to you –
> A: Uh-huh
> Q: - and your – your company's going to issue title insurance and you're going to be the escrow agent and do the closing, is that agreement already reached between the parties, the terms of the agreement?
> A: Usually it is. I mean we don't get involved in – are you talking about like a buy and sell agreement?
> Q: Correct.
> A: We don't get involved in that at all. They just present it to us.
> Q: In the state of West Virginia, who prepares those documents?
> A: I don't know. I don't really know anything about West Virginia. That's why we – West Virginia – see, some states are attorney states; in other words, they do the title insurance and everything. And then West Virginia, I noticed that that's one of those states because that was an attorney.
> Q: Okay.
> A: So we just – if there's anything legal that has to be done, he would do it. We wouldn't.
> Q: An attorney's office prepares those documents, and then eventually comes – those documents come to you –
> A: Yes.
> Q: - when it's time to close the transaction?
> A: That's correct.
>
> A: It's all either in the contract or the people buying and selling tell us. Like if there's let's say a lease. They would tell us what the lease is going to – how much the rent would be.
> Q: Okay. So you rely upon somebody involved in –
> A: Well, we don't come up with the figures.
> Q: Right. You rely on information received from somebody involved in the transaction –
> A: Absolutely.
> Q: - as to who you send the money to?
> A: Absolutely.
> Q: Okay. And then you just follow your instructions and send the money?
> A: Yes.

*Id.* at 125–126, 128–129. No witness provides contrary testimony. Therefore, there is no evidence to support the claim that Ms. Sullivan fraudulently concealed any information, as she did not see

the appraisals and any information regarding the prices of the property was provided to her by the parties to the transactions – namely by Mr. Brosnac who was representing the Reshes. This finding also supports the notion that any alleged "indicia of fraud"[5] would not have been apparent to Ms. Sullivan, despite the alleged disparity in prices between to the two legs of the transaction, because (1) all of the documents were provided to her by the parties themselves, (2) the documents contained the requisite signatures (indicating the parties read and understood the terms contained therein), and (3) the Reshes had a fully informed representative at the closing protecting their interests.

Next, the Reshes claim that Ms. Sullivan had a duty to disclose the double escrow nature of the transactions, even though this double-escrow transaction was already spelled out in the transaction documents. Defendants' expert, Susanne Lunsford, claims "all the title companies I've worked for and worked with, they all have that form," referencing form language she claims must be read to parties if a transaction is a double escrow transaction. *Third Party Defs.' Mot. for Summ. J.*, ECF No. 538, Ex. 11, at 122. Ms. Sullivan also acknowledges that this was a common practice when double escrow transactions occurred. *Third Party Pls.' Resp. to Third Party Defs.' Mot. for Summ. J.*, ECF No. 555, Ex. 5, at 85–86. However, even if there was a duty imposed on Ms. Sullivan to disclose the double escrow nature of the transaction, Defendants provide no evidence that this "concealment of facts" was "coupled with an intention to mislead or defraud." Rather, the Reshes had ample opportunities to learn of this information, and signed various documents that clearly referenced the double escrow. Additionally, their agent, Mr. Brosnac, was well aware of the double escrow nature of the transactions. Therefore, this claim is without merit.

As such, Third Party Defendants' Joint Motion for Summary Judgment with regards to

---

[5] The Reshes argue that Ms. Sullivan had a duty to disclose "indicia of fraud" if she had knowledge of such fraud. *Third Party Pls.' Resp. to Third Party Defs.' Mot. for Summ. J.*, ECF No. 555, at 14.

Count II is GRANTED.

    D.   <u>Covenants of Good Faith and Fair Dealing</u>

Helen Sullivan and Lawyer's Title note that they are not mentioned in the title line of Count III of the Third Party Complaint alleging a breach of the covenants of good faith and fair dealing, nor do the Count's allegations mention Lawyer's Title or Ms. Sullivan. "Nevertheless relief is requested in Count III against Lawyer's Title and Ms. Sullivan." *Third Party Defs.' Mem. in Supp. of Mot. for Summ. J.*, ECF No. 540, at 14. Third Party Defendants go on to state "[n]owhere in Count III of the Third-Party complaint do the Reshes identify any actual contract between them and Lawyer's Title/Ms. Sullivan, let alone any contract provision allegedly breached by them." *Id.* Third Party Plaintiffs did not dispute this argument, nor did the Reshes mention Count III at all in their Response Memorandum against Helen Sullivan and Lawyer's Title.

As such, Third Party Defendants' Joint Motion for Summary Judgment is GRANTED as to Count III because (1) West Virginia does not recognize a stand-alone claim for a breach of the implied covenant of good faith and fair dealing, absent a claim that a contract provision has been breached,[6] and (2) the inclusion of Helen Sullivan and Lawyer's Title only in the request for relief is insufficient.

    E.   <u>Negligent Misrepresentation and Negligence</u>

In Counts IV and V of the Third Party Complaint, the Reshes allege negligent misrepresentation and negligence against Helen Sullivan and Lawyer's Title. These claims are premised on a failure of alleged duties to (1) "monitor" and "investigate" "each of these three transactions and alert Defendants to any irregularities," (2) "ensure" and "monitor" "that no irregularities took place during the course of Defendants' acquisition of the three West Virginia

---

[6] *Gaddy Eng'g Co. v. Bowles Rich McDavid Graff and Love LLP*, 746 S.E.2d 568, 578 (W. Va. 2013).

properties," and (3) "inform Defendants of any irregularities arising during the three transactions by which Defendants took title to the properties at issue." *Third Party Compl.*, ECF No. 20, at 31–36. These arguments are unfounded. There is no legal basis for the alleged duties Defendants claim Helen Sullivan owed them as an escrow agent.

First, Ms. Sullivan, as an escrow agent, was not even engaged in these transactions until after the double escrow nature of the transaction and the price the Reshes were paying had already been agreed to by the Reshes. As Third Party Defendants point out, "[a]n escrow agent engaged after agreement to these critical terms cannot be charged with a duty requiring her to have represented the Reshes' interests before she became involved . . . ." *Third Party Defs.' Mem. in Supp. of Mot. for Summ. J.*, ECF No. 540, at 15. Second, the Reshes cite no legal authority for imposing duties on an escrow agent to "monitor", "investigate", and "inform" Defendants of any irregularities in the transactions. Rather, Defendants own expert testified that investigating into a transaction violates an escrow agent's fiduciary duty to be neutral to each party. *Third Party Defs.' Mot. for Summ. J.*, ECF No. 538, Ex. 11, at 122, 130–131. Ms. Sullivan's sole role was to obtain signatures on documents which the parties had already prepared and which included the terms the purchaser had already agreed to (including the double escrow nature of the transactions and the price of the properties). She had no duty to inform Third Party Plaintiffs of details that she thought had already been communicated to them due to their signatures on documents outlining the terms of the transactions.

Finally, the Reshes claim that Ms. Sullivan, herself, recognized that "small papers" should have been sent to the Reshes that again disclosed to them the double escrow nature of the transaction. *Third Party Pls.' Resp. to Third Party Defs.' Mot. for Summ. J.*, ECF No. 555, Ex. 5, at 85–86. However, even if this is common practice and even if the "small papers" were not sent,

this does not rise to the level of negligence on behalf of Ms. Sullivan and Lawyer's Title. Prior to the closing, the Reshes signed several documents, indicating that they read and agreed to the terms contained therein, but failed to investigate the financials behind the purchase price and the "flip" nature of the transactions. Further, the Reshes had a representative, Mr. Brosnac, throughout this entire process. This duty to communicate critical terms would have fallen on him, not the escrow agent whose minimal involvement occurs only at the closing of the transaction. The duties the Reshes attempt to impose on Ms. Sullivan are simply outside her responsibilities as an escrow agent.

As such, Third Party Defendants' Motion for Summary Judgment on Count IV and V is GRANTED.[7]

F.   Unjust Enrichment

In Count VI of the Third Party Complaint, the Reshes argue that Ms. Sullivan and Lawyer's Title were unjustly enriched because they "received fees and commissions for their participation in the Defendants' acquisition of the West Virginia properties, without doing any work to justify their receipt of these fees and commissions." *Third Party Compl.*, ECF No. 20, at 38. This is argument is unfounded because, as indicated in the previous sections of this Opinion, Ms. Sullivan properly performed her duties as an escrow agent, and the transactions successfully closed. She is therefore entitled to compensation for this work.

The Court agrees with the following synopsis provided by Third Party Defendants:

It is undisputed that the escrow services were performed by Ms. Sullivan and the transaction closed. There simply is no evidence Ms. Sullivan improperly performed her duties. She had no responsibility to negotiate the terms, to review the terms or to question the terms, which had been agreed to by the Reshes before she even became involved. As escrow agent she never saw the appraisal and there is no

---

[7] Third Party Defendants also raise a statute of limitations defense to Counts I, II, IV, and V. Because these claims are already being dismissed per the discussion supra, there is no need to discuss this argument.

evidence she ever saw the operating and income statements in this transaction. Even if she had, as a lay person she had no expertise or training to be able to analyze them for "faulty methodology" or "irregularities" and a duty to do so cannot be imposed on her. The Real Estate Sale Agreement and the April 10, 2006 amendment clearly disclosed the double escrow nature of the transaction, that Peanut Oil did not own the three Properties at the time it was signed, and that the Reshes loan would be the only loan. The structure of the transaction which the Reshes claim permitted them to allegedly be defrauded was in place before Ms. Sullivan even entered the picture as an escrow agent for their transaction. Ms. Sullivan fulfilled the duties required of her as escrow agent and received appropriate payment. The Reshes provide no evidence otherwise.

*Third Party Defs.' Mem. in Supp. of Mot. for Summ. J.*, ECF No. 540, at 16–17. For these reasons, as well as the reasoning, facts, and evidence incorporated from Sections III (A)–(E), the Reshes claim fails.

As such, Third Party Defendants' Motion for Summary Judgment as to Count VI is GRANTED.

G. RICO

Count VII alleges that Helen Sullivan and Lawyer's Title engaged in violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. § 1961, *et. seq*. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." § 1962(c). The Supreme Court has clarified that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Specifically, that individual "must participate in the operation or management of the enterprise itself." *Id.* at 185. A pattern of racketeering activity is defined as "at least two acts of racketeering activity," § 1961(5), and racketeering activity includes mail fraud and wire fraud, § 1961(1), which Defendants allege occurred here. The elements of mail

fraud and wire fraud are: "(1) the existence of a scheme to defraud and (2) the use of the mails or wire communication in furtherance of the scheme." *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006).

Once again, for reasons nearly identical to the Court's analysis in two prior opinions, the Court finds Defendants' arguments regarding Helen Sullivan and Lawyer's Title's involvement in the alleged RICO scheme unfounded because Helen Sullivan lacked the requisite amount of control over the alleged enterprise. For this reason, the RICO claim against Helen Sullivan, and consequently Lawyer's Title, must be dismissed. *See First Cent. Sav. Bank v. Meridian Residential Capital*, No. 09-cv-3444, 2011 WL 838910 (E.D.N.Y. Mar. 3, 2011) (dismissing RICO claim against appraisal company alleged to have over-appraised the value of properties, where there were no facts showing that the appraisal company had control over the alleged enterprise); *Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 373 F. Supp. 2d 829 (S.D. Ind. 2005) (dismissing RICO claims against appraisers because their participation in alleged overvaluing of properties did not satisfy the *Reves* operation and management test); *see also Reves*, 507 U.S. at 186.

The Court has already dismissed several parties from this dispute due to Defendants' failure to adequately plead and/or sufficiently provide evidence to prove that the respective parties had control over the alleged RICO enterprise. The Court incorporates its reasoning, facts, and evidence from Section III (A)–(F) which conclude that Third Party Plaintiffs provide no evidence sufficient to support an allegation of participation in a RICO scheme, let alone evidence of any control that Helen Sullivan exercised over an alleged RICO scheme. Simply summarized, Helen Sullivan properly performed her duties as an escrow agent. That is the extent of her involvement in these transactions.

Furthermore, Ron Resh specifically indicated in his own testimony that he did not believe that Helen Sullivan or Lawyer's Title conspired in any alleged enterprise or that there even was an enterprise beyond Andrew Brosnac and Sam Pearson.

> Q: Right. But as far as these allegations of wrongdoing – <u>and I'll throw the title company in there, too</u> – that you testified before that the bank, the appraiser, and the title company – although you think all three did something wrong or things wrong – that they did those things wrong independently, that they didn't combine together –
>
> A: No. I don't think they plotted.

*Pl.'s Mot. for Summ. J.*, ECF No. 539, Ex. 2, at 296, 353 (emphasis added). While his statements are not fatal to the RICO claim on their own, his testimony does nothing to bolster the claim that Helen Sullivan, and consequently Lawyer's Title, participated in, let alone exercised the requisite amount of control over, the alleged RICO enterprise. This lack of control is sufficient grounds for dismissing the RICO claims against Helen Sullivan and Lawyer's Title.

Therefore, Third Party Defendants' Joint Motion for Summary Judgment as to the RICO claim is GRANTED and Count VII is dismissed.

### H. Motion for Summary Judgement against Realty Concepts, Ltd.

Third Party Defendants Helen Sullivan and Lawyer's Title also filed a Motion for Summary Judgment (ECF No. 542) against Third Party Defendant Realty Concepts, Ltd. regarding Realty Concept's cross claims for contribution and implied indemnity. However, as indicated in the reasoning, facts, and evidence incorporated from Section III (A)–(G), Helen Sullivan and Lawyer's Title have been found not liable for the Reshes' alleged injury in this case. As such, Realty Concepts, Ltd., as another Third Party Defendant, has no right to contribution because Helen Sullivan and Lawyer's Title were not "joint tort-feasors" in any alleged misconduct. *Crum v. Appalachian Elec. Power Co.*, 29 F. Supp. 90, 91–92 (S.D.W. Va. 1939). Similarly, Realty

Concepts, Ltd. is not entitled to implied indemnification because Helen Sullivan and Lawyer's Title were not "the actual case of the injury." *Harvest Capital v. W. Va. Dep't of Energy*, 560 S.E.2d 509 (W. Va. 2002).

As such, Third Party Defendants Motion for Summary Judgment against Realty Concepts is GRANTED.

### III.    Conclusion

For the foregoing reasons, Third Party Defendants Helen Sullivan and Lawyer's Title Insurance Corporation's Joint Motion for Summary Judgment on all Claims Asserted Against them by Third Party Plaintiffs Ronald Resh and Valarie Reynolds-Resh (ECF. No. 538) and Third Party Defendants Helen Sullivan and Lawyer's Title Insurance Corporation's Joint Motion for Summary Judgment on all Claims Asserted Against them by Third Party Defendant Realty Concepts, Ltd. (ECF No. 542) are **GRANTED**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        February 12, 2016

ROBERT C. CHAMBERS, CHIEF JUDGE